UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

-vs-

    Case No. 20-cr-20233
    Hon. Bernard A. Friedman

D-5   DR. JOHN SWAN,

     Defendant.

_____/

## **MOTION TO SUPPRESS EVIDENCE AND FOR RETURN OF PROPERTY**

Defendant, Dr. John Swan, by and through his attorneys, Hertz Schram PC by Michael Rex respectfully requests this Honorable Court enter an order suppressing from evidence items seized pursuant to an unlawful search warrant issued without probable cause and without the necessary nexus between the place to be searched and the items seized, and to further order the return of all documents, computers and electronic devices so seized. The facts and laws in support of this motion are more fully set forth in the attached Memorandum.

Defendant has sought concurrence in the relief requested from the Assistant United States Attorney and that request has been denied.

{H0843652.13}

Respectfully submitted,

Hertz Schram PC
Attorneys for Defendant

/s/ Michael J. Rex (P35753)
1760 S. Telegraph, Suite 300
Bloomfield Hills, MI 48302-0183
(248) 335-5000
mrex@hertzschram.com

Dated:  June 30, 2021

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

-vs-
                                    Case No. 20-cr-20233

D-5   DR. JOHN SWAN,
                                    Hon. Bernard A. Friedman

      Defendant.

_____/

## **MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE AND FOR RETURN OF PROPERTY**

### **Introduction**

On June 11, 2020, law enforcement personnel from the Clinton Township Police Department and Drug Enforcement Administration executed a search warrant at Defendant Dr. John Swan's residence. The warrant authorized the seizure of a lengthy list of items including the following:

1. Controlled Substances
2. Personal identity documents.
3. Health insurance, billing information and medical records.
4. Documents and records regarding sale of controlled substances.
5. Documents evidencing the acquisition of controlled substances.
6. Coded or cryptic notes in a foreign language.
7. Currency or substitute proceeds.
8. Money counter or materials for packaging bulk currency.
9. Any document that can be used to carry out drug trafficking or health care fraud.

{H0843652.13}

10. Prescription monitoring data.

11. Any electronic device or computer including any wireless telephone "used to store, keep, or encrypt any data or digital/electronic information, as well as any stored information…"

(See Exhibit A, Application for Search Warrant, Affidavit, Attachments A and B, and Search and Seizure Warrant).

The Government utilized a single Application and Affidavit for Search Warrant to support the issuance of five separate warrants for authorization to conduct searches at five "Target Locations."[1] The affidavit in support of search warrant was offered by Robert Nielsen, a Clinton Township police officer assigned to a task force of the DEA. It is 86-pages long. It sets forth the affiant's training and experience, a general overview of "typical' drug diversion schemes, some background as to how the investigation began, and a case overview describing how the drug trafficking organization under investigation operates. The affidavit then contains separate sections pertaining to each of the four target locations, purportedly setting forth what the affiant believes is probable cause for searching each of the locations and the basis for seizing the items specified.

Despite its length, the affidavit is short on *facts*. Rather than present the Magistrate with factual allegations, so that he could draw whatever conclusions they merit, the affiant simply described an investigation he had been involved in,

---

[1] Four of the Target Locations were the residences of four named defendants including Dr. John Swan. The fifth "Target Location" was the vehicle owned by Dr. Swan.

and stated *his* conclusion that a drug trafficking organization ("DTO") is operating in the Detroit area. To support probable cause for searching Swan's residence (and car), the affiant cited excerpts from 4 intercepted telephone calls (only one of which Swan is a participant) to establish that Swan has a relationship with others allegedly involved in the alleged DTO. And, without explaining why the property sought constitutes evidence of criminal activity, or why there is probable cause to believe that it would be found at Dr. Swan's residence, the Application seeks a laundry list of items, including things such as "coded or cryptic notes…in a foreign language," that have no conceivable relationship to anything alleged in the Affidavit. The search of Defendant's residence was conducted on June 11, 2020 and resulted in the seizure of two I-phones, one TCL phone, one I-pad, one laptop, miscellaneous documents and one USB memory stick. (See, Exhibit "B")

In sum, the affidavit contains a series of conclusory statements instead of a factual showing that criminal activity had occurred and, as to Dr. Swan's residence, it failed to establish a nexus between the items sought and the places to be searched.

### Law Governing Search Warrants

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures. *U.S. Const. Am. IV.* To protect that interest, a search warrant may issue only upon a showing of probable

cause. "Probable cause is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. King*, 227 F.3d 732,742 (6th Cir. 2000). Review of the affidavit and search warrant is based on a "totality of the circumstances" determination with deference to the magistrate judge's finding of probable cause. *Id. United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc). However, that deference is not absolute, and a reviewing court must ensure that the issuing magistrate did "not serve merely as a rubber stamp for the police." *United States v. Leon*, 468 U.S. 897, 914 (1984). In doing so the reviewing court is "limited to information presented in the four corners of the affidavit." *United States v. Jackson*, 470 F.2d 299, 306 (6th Cir. 2006).

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). In short, the affidavit in support of the warrant must set forth "a nexus between the place to be searched and the evidence sought." *United States v. Beals*, 698 F.3d 248 , 364 (6th Cir. 2012); *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010); *United States v. McPherson*, 469 F.3d 518, 524 (6th Cir. 2006); *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 1998).

### The Affidavit is Short on Facts, Long on Conclusions

Here, the affidavit in support of the search warrant for Dr. Swan's residence falls short of these fundamental principles. It begins with an "Introduction" where the affiant sets forth his training and experience in drug diversion investigations. (Exhibit A, pgs. 000835-000838) He claims familiarity "with all aspects of this investigation" and identifies the five "Target Locations" for which he is seeking authorization to search. Here the affidavit notes that the affiant "has not included each and every fact known to him concerning the investigation," which is prophetic since the affidavit contains so few actual facts.

The next section of the affidavit is entitled "Prescription Opioid Diversion Overview." It describes the key components of prescription drug diversion schemes generally and the roles of various participants in "typical" drug diversion schemes. (Ex. A, 000838-000840)

The affidavit then sets forth the "Background of The Investigation & Wire Intercepts." (Ex. A, 000840-000842) In it, the affiant describes an investigation that began on September 8, 2018, following the search of a car in which controlled substance prescription receipts were found that did not belong to the driver. The driver's phone was seized and searched and "your affiant was able to determine that Hamblin and, Robert King and other co-conspirators were involved in prescription drug diversion." The affiant does not share any of the information acquired from the phone nor any other information that supported his

{H0843652.13}                                                5

determination. From there, the affidavit leaps to September 3, 2019, and describes a series of wire intercepts that were authorized by the Honorable Gershwin Drain between September 2019 and March 18, 2020.

The affidavit then sets forth a "Case Overview" that identifies the various agencies involved in the investigation of a prescription narcotic diversion scheme in the Detroit area involving 31 named individuals, and ends with the conclusory language, "who cause illegitimate prescriptions for controlled substances to be dispensed at various pharmacies." (Ex. A, 000842-000846). The Overview states that "New Vision Rehab Center, owned by Rankin, is known to be an active business where conspiring providers and members of the DTO obtain, produce, and sell illegitimate and/or fraudulent prescriptions." The affidavit neglects to say to whom this is known or how it is known. It is a matter the reviewing Magistrate is asked to accept on faith, without any factual support. The affiant further concludes that Rankin is able to oversee and facilitate the drug diversion scheme due to his role at New Vision, and that he recruits and hires doctors, nurses and medical professionals at the clinic, including Swan and six other named individuals. The affiant "*believes* that each of the medical professionals above have issued controlled substance prescriptions outside the course of professional practice and for no legitimate medical purpose." (emphasis added) The affiant may

well believe it, but he gave the reviewing Magistrate no basis for making that determination.

"To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain *facts* that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." (emphasis supplied) United States v. Abboud, 438 F.3d 554, 569 (6th Cir. 2006) (citing, Frazier, 423 F.3d at 537). When reviewing an application for a search warrant, the Magistrate is charged with the responsibility of making an independent determination of whether probable cause exists based on the "totality of the circumstances." *Illinois v. Gates,* 462 U.S. 213 (1983). This "totality of the circumstances" test has been stated in the following manner:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238.

A proper decision cannot be rendered unless the "affidavit . . . provide[s] the magistrate with a substantial basis for determining the existence of probable cause. . . ." *Id.* at 239. "[M]ere conclusory statements" by the affiant are insufficient and the magistrate's decision "cannot be a mere ratification of the bare conclusions of others." *Id.*

An affidavit that includes only wholly conclusory statements – as this one does - fails to the meet the probable cause requirement. *United States v. Dunning*, 857 F.3d 342, 346 (6th Cir. 2017).

After much general discussion, the affidavit eventually addresses what the affiant believes is probable cause to search each of the target locations. As to the probable cause for searching Dr. Swan's residence, the affidavit states that he is a licensed osteopathic physician and gives his controlled substance license number and DEA registration number. (Ex A, 000895) It describes the following observations made through surveillance on 4 occasions:

1) March 20, 2020. Swan was seen exiting New Vision Rehab Center going to his car carrying a "black shoulder bag or laptop and white lab coat." He drove to a bank and conducted a transaction at the drive-up window, then drove home and took his lab coat and "back-pack" into the house. (Whether the shoulder bag and back- pack are the same is unknown).

2) March 26, 2020. Swan was seen leaving his residence and driving to Crowne Pointe Plaza in Oak Park, a building that houses numerous medical businesses. He arrived at 9:51 am and walked into the building with a white lab coat and black duffel bag.

3) April 13, 2020. Swan was seen driving to the Crowne Pointe Plaza location again and going into the building at 10:07 am carrying his laptop.

4) May 21, 2020. Swan was seen exiting New Vision at 1:46 pm carrying a black laptop then driving away.

(Ex A, 000896-000897)

Presumably, the point of this surveillance information is to show that Swan was seen carrying certain items from his car to New Vision, however, it is not even clear what he was seen carrying. The first surveillance indicates he was seen carrying a " black shoulder bag or laptop" from New Vision to his car. (para.144) The second surveillance states he took a "black duffle bag' from his home to Crowne Plaza and the fourth claims he was seen leaving New Vision with a "black back pack." (paras. 145,148) At best there was a one-time observation of a laptop, but there is no further information, no further vague observations to the effect that Dr. Swan actually used a laptop at New Vision, in what manner he used it, or more importantly, that it contained evidence of illegal activity.  The logic that underlies a request to seize any electronic devises or computers is simply that; the affiant believes drug diversion is being conducted at New Vision, Dr. Swan was seen taking a laptop (or shoulder bag) to New Vision once in March and once in May, therefore there is evidence of criminal activity on the computer.

The Affidavit then sets forth transcript excerpts from four intercepted telephone conversations. (Ex A, 000897-000912) The first is a call between Defendant Rankin and Lavar Carter which the affiant interprets as a discussion between the two of them about how Rankin is going to pay for Swan's work at "Nikki's clinic." The affiant states his belief that Swan worked part-time at Nikki's on lease from Rankin to work at her clinic. The affiant further states that it his belief that Nikki was paying Swan on a daily or hourly basis and that Rankin believed the amount Nikki paid for Swan was less than the revenue she would make on prescriptions Swan wrote. He also believes that a portion of the conversation references Rankin's instructions to Carter to put cash money owed to Swan into an envelope for his pickup.

Aside from the fact that the affiant's interpretation of the conversation is wrong, the conversation offers little in the way of probable cause to justify a search of Dr. Swan's home or car.[2] Moreover, nowhere does the affiant tie or identify Nikki as a person involved in the alleged DTO or establish that Swan's relationship with her, whatever it may, be involves any criminal activity.

The second call involves Rankin, Carter and briefly, Swan. According to the affiant, Swan states he is owed "$40 per Norco, $60 per Percocet, and $90 per Oxycodone or Oxymorphone prescriptions he writes," and based on his training,

---

[2] In fact, Rankin is stating his belief that the amount Nikki paid for Swan was *more*, not less, than the revenue she would make on prescriptions Swan wrote.

paying doctors for each prescription and higher dollar amounts for more highly desired opioids incentivizes prescribers to write more prescriptions for stronger narcotics and that in the intercepted call. The Affidavit further states that the conversation indicates that Swan takes patient files related to New Vision Center out of the clinic and that he stated he will get files out of his vehicle to confirm how many patients he saw on a particular day and what prescriptions they received. It goes on to state that in March, and in April, investigators saw Swan bring bags and a lab coat in and out of his car where he was working (not at New Vision) and that he had been seen carrying a laptop into the one clinic. The affiant concludes his belief that "patient files and other evidence related to Rankin's clinics could reasonably be located in Swan's vehicle, residence and laptop computer." What this conversation and the affiant's interpretation show is that Swan took *files* with him. It effectively negates the assertion that he maintained files or evidence of criminal activity on his computer because, in fact, he was heard to retrieve hard copy files. Thus, there is nothing in this conversation or anywhere else to support a finding that computers are used at New Vision or in conducting the ill-defined DTO. Nor, is there anything showing cellphones were used in any illegal fashion (other than by Rankin to make phone calls, which were already the subject of authorized wire intercepts) or that they would contain evidence of illegal activity.

The Affiant's entire explanation for requesting seizure of computers and cellphones is contained in a single paragraph:

> 174. It has been my experience and training that as a general rule, medical professionals and those who work with medical businesses rely upon computers for the creation and storage of data, including prescription fill data and other financial and business records. It is likely that the people living in and or using the Target Locations may access insurance billing and records of patient prescription fills, including records, documents and materials, will be found stored on computers at the Target Locations. In light of the COVID-19 pandemic, more and more people – including people working in the medical field – are working from home. Therefore, it is likely that during this time, work-related items will be found in residences.

There are multiple shortcomings in this paragraph, beginning with application of what the affiant believes the general practice is for medical professionals, to what he alleges is anything but a general medical practice. His claim, unsupported by facts, is that the investigation has uncovered a DTO, not a general medical practice.

In addition, the paragraph states that "people living in and/or using the Target Location may access insurance and billing records ..." without identifying the people referred to. The contention that some unknown individual *may* be accessing certain records is a far cry from probable cause to believe computers to be seized from an individual's home contains evidence of a crime. Lastly, the speculation that "in light of the COVID-19 pandemic" more people in the medical

field are working from home therefore work-related items will be found at home, is no more than a general proposition that has no application to Dr. Swan. Although the paragraph says nothing specifically about Dr. Swan or his residence, earlier in the affidavit it was pointed out that surveillance determined that Dr. Swan is one of the medical professionals that was *not* working from home. (Ex A, ¶¶ 144-148)

Paragraph 174 is contained in a section of the Affidavit entitled Request to Seize Computers, Computer Records, Cellular and Electronic Devices. (Ex. A, 000916-000920) This section purportedly sets forth the probable cause to seize the cellphones, computers and other electronic data but it doesn't cite any facts to substantiate the "general rule" or the likelihood that "people living in or using the target locations" will access billing materials on computers at those locations or more importantly that the information will provide evidence of criminal activity. The affiant set forth an 86-page affidavit seeking to seize Defendant Swan's cellphones and computer which, in this day and age, contain a person's life story, and vast amount of private information. As the Supreme Court has recognized, "[T]he term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as telephones. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley v. California*, 573 U.S. 373, 393 (2014).  When seeking access to

this vast array of personal information, a general statement about medical professionals typically using computers and that people at the target locations may have such materials on their computers, is hardly the type of showing that justifies a governmental intrusion of this nature and magnitude. In fact, unlike the other portions of the affidavit that contain conclusory statements, the section governing the seizure of cellphones and computers does not even draw a hard fast conclusion but simply suggests the likelihood that such data may be held by persons (without specifying which persons) at various target locations. This is not an individualized showing, it is barely a showing at all, and it is woefully deficient in establishing probable cause for the search and seizure of Dr. Swan's cellphones and computers.

The affidavit cites a third conversation between King and Rankin in which King asks how he can get prescriptions in Swan's name rather than another doctor's, Kenewell's. Rankin explains he can get Swan's name on prescriptions rather than Kenewell's but that they have to create fake MRIs and other fake documentation to do so that. The affiant believes Rankin is talking about fabricating documents to make them appear legitimate. This suggests that Dr. Swan was not involved in issuing scripts for no legitimate medical purpose, but rather that Rankin needs to deceive Dr. Swan by manufacturing medical support for the issuance of prescription medication. It suggests that Dr. Swan is outside the alleged DTO.

The final referenced intercept is a conversation between Rankin and Carter which indicates to the affiant, that Rankin paid Swan in cash, and therefore it is reasonably likely that Swan maintains some of the cash proceeds at his residence. This conclusion is contradicted by the surveillance conducted March 20, 2020, when Swan was seen going to the bank and conducting a transaction. Based on the overall information in this affidavit, it is more likely that cash is being deposited in a bank, not being stashed at his residence.

The affidavit in this case begins with a conclusion; that there exists a drug trafficking organization that Dr. Swan was part of. But even if one were to assume the existence of a drug trafficking organization as described, and even if one were to further assume the wire intercepts excerpted in the affidavit show some relationship between Dr. Swan and others allegedly connected with the alleged DTO, there is still nothing in the affidavit that gives cause to believe that there will be evidence, of the type sought in the extensive warrant, at Dr. Swan's residence. In fact, the affidavit does not even mention most of the items to be seized. There is no allegation or even suggestion that Dr. Swan was ever in possession of any controlled substances, or that he would have any health insurance records on his premises nor any documents, ledgers, tally sheets evidencing the distribution of controlled substances. There is certainly no evidence to suggest he would have "coded or crypted notes … in a foreign language" nor a money counter. And again,

there is no suggestion that he had, let alone utilized his cellphone in any manner in connection with the alleged but unsubstantiated drug trafficking organization.

### This Unlawful Search Cannot be Spared on a Claim of Good Faith

Once this court finds that the search warrant lacks probable cause, the court must determine whether the exclusionary rule should bar the admission of the evidence under the good-faith exception. *United States v. Leon*, 468 U.S. 897 (1984). The inquiry is whether there is "objectively reasonable reliance" by law enforcement on the invalid search warrant. *Carpenter, supra, at 595.* Under Leon the good faith exception will not apply in four specific situations: (1) when the search warrant is issued on the basis of an affidavit that the affiant knows, or should know, contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable, or where the application was supported by nothing more than a "bare bones" affidavit; or (4) when the warrant is so facially deficient that it cannot reasonable be presumed to be valid. *Leon, supra*, 468 U.S. at 914; *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004).

Here, because the affidavit fails to set forth *any* facts to support the existence of a DTO of which Swan was a knowing participant, the warrant issued ran afoul

of the second, third and fourth exceptions.  Since there is nothing in the affidavit to support the issuance of the search warrant for evidence of a crime at Swan's residence, the examining magistrate "wholly abandoned his judicial role" and simply acted as a rubber stamp for the officer's request for the search warrant. Moreover, the affidavit does not even provide a skeletal offer of probable cause as to several of the items sought. There is no evidence that Swan even possessed or used a cellphone, let alone used one in connection with any drug diversion activity. (The intercepted conversation in which he briefly participated was a call between Rankin and Carter.) These types of affidavits fit squarely within the third exception set forth in *Leon*.  See, *United States v. Hython*, 443 F.3d 480, 489 (6th Cir. 2006) ("[T]he affidavit is patently insufficient.  No well-trained officer could have reasonably relied on a warrant issued based on the affidavit" and therefore the good faith exception does not apply); *United States v. Laughton*, 409 F.3d 744, 748-79 (6th Cir. 2005), (citing to *Leon*, 468U.S. at 914-23); *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996).

An affidavit lacks the requisite indicia of probable cause if it is a "bare bones" affidavit.  *Laughton*, 409 F.3d at 748.  The inquiry into whether the affidavit is so bare bones as to defeat application of the good faith exception is less demanding than the inquiry as to whether the affidavit provides a substantial basis for the magistrate's finding of probable cause.  *Id* at 748-49.

{H0843652.13}                                              17

## Request for Relief

Accordingly, and for the foregoing reasons, Defendant respectfully requests this Honorable Court enter an Order:

1.    Suppressing from evidence any of the items it seized from Defendant Swan's residence as well as the contents of any of the evidence seized from the computers or electronic devices.

2.    Directing the Government, pursuant to F.R.Cr.P., Rule 41(g) to return all items seized from Defendant Swan's residence.[3]

Respectfully submitted,

Hertz Schram PC
Attorneys for Defendant

/s/ Michael J. Rex (P35753)
1760 S. Telegraph, Suite 300
Bloomfield Hills, MI 48302-0183
(248) 335-5000
mrex@hertzschram.com

Dated:  June 30, 2021

---

[3] The affidavit for Search Warrant specifically stated that the electronic devices and computers would be searched on-site if reasonable, otherwise they would be seized for purposes of conducting an off-site search. If it was determined that "the data reviewed does not fall within the items to be seized, the government will return these items within a reasonable time."  The cellphones were returned 6/1/21. At that time counsel was informed that the review of the computers had still not been conducted.

{H0843652.13}                                18

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2021, I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system which will send notification of such filing to the ECF participants.

Hertz Schram PC
Attorneys for Defendant

/s/ Michael J. Rex (P35753)
1760 S. Telegraph, Suite 300
Bloomfield Hills, MI 48302-0183
(248) 335-5000
mrex@@hertzschram.com